UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL M. SOARES,<br>CDCR #F-39579,<br><br>                                    Plaintiff,<br><br>            vs.<br><br>DANIEL PARAMO, Warden;<br>G. STRATTON, Associate Warden;<br>M. FLYNN, Correctional Counselor;<br>E. PHAN, Psychologist; and<br>LAURA LEARD, Personal<br>Representative for the Estate of Jan<br>Hansson,<br><br>                                    Defendants. | Case No.:  3:13-cv-02971-BTM-RBB<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos.  55, 84]** |

MANUEL M. SOARES ("Plaintiff"), a prisoner currently incarcerated at the California Health Care Facility in Stockton, is proceeding pro se and in forma pauperis ("IFP") in this civil action pursuant to 42 U.S.C. § 1983.

In his Complaint (ECF No. 1), and in a Supplemental Complaint (ECF No. 7), Plaintiff contends Defendants violated his Fourteenth Amendment rights in 2012 when they transferred him involuntarily from Richard J. Donovan Correctional Facility ("RJD") to Atascadero State Hospital ("ASH"), and then retaliated against him after he

1

returned to RJD in 2013 for exercising his First Amendment right to petition for redress regarding the transfer. *See* ECF No. 1 at 8, 13; ECF No. 7 at 9-10.

## I.   Procedural History

On August 5, 2014, the Court granted Plaintiff leave to proceed IFP pursuant to 28 U.S.C. § 1915(a) and screened both Plaintiff's Complaint and his Supplemental Complaint before service as required by 28 U.S.C. § 1915(e)(2) and § 1915A(b) (ECF No. 9). The Court sua sponte dismissed Warden Paramo without prejudice as a party on respondeat superior grounds, *see* ECF No. 9 at 7-8, but found Plaintiff's due process and retaliation allegations against Defendants Stratton, Flynn, Hansson,[1] and Phan sufficient to state plausible claims upon which relief may be granted. *Id.* at 9 (citing *Carty v. Nelson*, 426 F.3d 1064, 1074 (9th Cir. 2005); *Vitek v. Jones*, 445 U.S. 480, 494-97 (1980); *Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012)).

On September 8, 2015, the Court denied Defendants' Motion for Summary Judgment based on claims that Plaintiff had failed to exhaust his administrative remedies before filing suit pursuant to 42 U.S.C. § 1997e(a) (ECF No. 34). Defendants filed an Answer on September 22, 2015 (ECF No. 35), and soon after, on October 9, 2015, U.S. Magistrate Judge Ruben B. Brooks issued a Scheduling Order Regulating Discovery and other Pre-trial Proceedings (ECF No. 43). On May 25, 2016, the Court granted Plaintiff leave to join additional parties and/or amend his pleadings, and denied without prejudice his subsequent Motion for Summary Judgment (ECF No. 55) as premature in light of his anticipated amendment (ECF No. 61). However, Plaintiff later decided to stand on his original pleadings (ECF Nos. 67, 68). The discovery period closed on August 15, 2016 (ECF No. 43 at 3).

---

[1] Defendant Jan Hansson, a psychiatrist at RJD, died while this action was pending, on February 23, 2016. *See* ECF No. 83 at 1; ECF No. 86 at 2; ECF No. 96 at 1. On January 11, 2017, the Court granted Plaintiff's Motion to Substitute Dr. Laura Leard, the personal representative for Hansson's estate, as the successor to and proper party in place of Defendant Hansson pursuant to FED. R. CIV. P. 25(a) (ECF No. 109).

2

On August 16, 2016, one day after the close of discovery and approximately one month before the September 12, 2016 pre-trial motion cut-off date, Defendants' counsel filed their initial notification of Hansson's February 23, 2016 death (ECF No. 83).

On September 9, 2016, counsel for the surviving Defendants (Phan, Flynn, and Stratton) filed a Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 (ECF No. 84).[2] On September 13, 2016, the Court notified Plaintiff of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc), and set a briefing schedule (ECF No. 85).

On October 4, 2016, the Court granted Plaintiff's subsequent request to "recall" his previously filed Motion for Summary Judgment (ECF No. 55), and granted Defendants an opportunity to file an Opposition (ECF No. 89). Plaintiff filed his Opposition to Defendants' Motion on October 6, 2016 (ECF No. 90), and Defendants filed their Opposition to Plaintiff's Motion on October 21, 2016 (ECF No. 93). After no replies were submitted, on November 4, 2016, the Court determined no oral argument was required, and took both Plaintiff's and Defendants' Motions for Summary Judgment under submission for resolution on the papers pursuant to S.D. CAL. CIVLR 7.1.d.

Having carefully considered the record as submitted, the Court denies Plaintiff's and Defendants Phan and Stratton's Motions for Summary Judgment and partially grants and denies Flynn's motion. Genuine disputes of material fact exist as to both Plaintiff's due process and retaliation claims, and as discussed below, they require resolution at trial.

---

[2]  While Defendant Leard, in her capacity as personal representative for Dr. Hansson's estate, waived personal service on December 6, 2016 (ECF No. 103), and was substituted for Dr. Hansson on January 11, 2017, Leard has not sought leave to re-open discovery, or to extend the previously expired September 12, 2016 pretrial motion cut-off date in order to either file her own Motion for Summary Judgment, or seek leave to join the surviving Defendants' Motion.

## II.   Factual Background

### A.   Plaintiff's Claims[3]

On November 5, 2012, Plaintiff contends he was "called into Defendant Phan's office and asked to sign a referral form to commit him to a mental hospital." *See* ECF No. 1 at 6 ¶ 11 & Ex. A at 21; ECF No. 90-1(hereafter "Pl.'s Dep.") at 38-39, 41-43. Dr. Phan is a RJD psychologist. ECF No. 1 at 2, 5 ¶ 7. Plaintiff "refused to sign the document and became embroiled in a verbal conflict with [] Phan," who together with now deceased Defendant Hansson, a RJD psychiatrist, had "prior to this date ... attempted to entice Plaintiff into voluntarily going to ASH." *Id.* at 5-6 & Ex. A at 21, Mental Health Due Process Chrono ("CDCR 7480"), dated Nov. 5, 2012.

On November 16, 2012, Plaintiff claims he was called into Defendant Flynn's Office, and "informed that ... Flynn was going to take him to a *Vitek* hearing." ECF No. 1 at 6 ¶ 12; Pl.'s Dep. at 56-59.[4] Flynn is a Correctional Counselor at RJD. ECF No. 1 at 4 ¶ 6; Pl.'s Dep. at 58. Plaintiff claims Flynn "never interviewed or evaluated [him]" before the November 16, 2012 hearing, and that he was "given <u>no</u> written notice before the hearing." ECF No. 1 at 6 ¶ 12; Pl.'s Dep. at 56-57. Plaintiff alleges Flynn was introduced as his "staff assistant" *at* the hearing, but Flynn "did not say one word to defend [him],"

_____

[3] In addition to his deposition testimony, a transcript of which Plaintiff has attached as an exhibit to his Opposition to Defendants' Motion for Summary Judgment (ECF No. 90, Ex. C at 13-84), Plaintiff's Complaint, Supplemental Complaint and Motion for Summary Judgment contain factual allegations within Plaintiff's personal knowledge which are verified under penalty of perjury. *See* ECF No. 1 at 16; ECF No. 7 at 14; ECF No. 55 at 20. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir.1995) (holding that a complaint or motion duly verified under penalty of perjury pursuant to 28 U.S.C. § 1746 may be used as an opposing affidavit under Fed. R. Civ. P. 56.); *accord Norwood v. Woodford*, 661 F. Supp. 2d 1148, 1151 (S.D. Cal. 2009).

[4] In *Vitek v. Jones*, 445 U.S. 480 (1980), the Supreme Court held that an involuntary transfer of a state prisoner to a state mental hospital implicates liberty interests protected by the Due Process Clause of the Fourteenth Amendment, and therefore requires certain procedural safeguards prior to transfer. *Id.* at 493-96.

"did not act in [his] best interest," and instead, "was simply present." ECF No. 1 at ¶ 13; Pl.'s Dep. at 60-61, 65-66.

Plaintiff alleges Defendant Stratton, a RJD Associate Warden, "was the fact-finder decision maker" at the November 16, 2012 *Vitek* hearing, and at its conclusion, Stratton "informed Plaintiff that he was 'going to have to go with the doctor's recommendations' and commit [him] to a mental hospital." ECF No. 1 at 7 ¶ 14; Pl.'s Dep. at 60-61, 67. Plaintiff further contends that "at no time whatsoever was [he] given a written statement as to evidence relied on" or the "reasons for th[e] transfer." ECF No. 1 at 7 ¶ 14; *see also* Ex. D at 4, Classification: ICC Vitek Hearing ("CDC-128G") dated Nov. 16, 2012; Pl.'s Dep. at 56-57, 64-65.

Several days later, Plaintiff alleges he continued to object to Dr. Hansson and expressed his concerns related to the commitment. Specifically, Plaintiff told Hansson that he had spoken to Dr. Phan, and had opposed commitment "many times," on grounds that his brother, whom he had seen only once in ten years, was coming to visit from another country, and because he would be "devastated" to lose his culinary job at RJD. ECF No. 1 ¶ 15; Pl.'s Dep. at 42-44, 52, 66. Dr. Hansson allegedly told Plaintiff he would speak with Phan, and later indicated they would "hold off on []his transfer." ECF No. 1 ¶ 15; Pl.'s Dep. at 67. However, on November 26, 2012, Phan informed Plaintiff that after further consultation, they decided to move forward with his commitment. *Id.* ¶ 16; *see also* Ex. B at 28, Interdisciplinary Progress Notes ("CDCR Form MH-7230A"), dated Nov. 26, 2012.

Plaintiff was "transferred and committed" to ASH on November 27, 2012. *See* ECF No. 1 at 8 ¶ 17; Pl.'s Dep. at 67. After arrival, Plaintiff continued to object to his commitment, and expressed his desire to return to RJD. ECF No. 1 at 8 ¶ 17. On December 11, 2012, Plaintiff was assessed by a Counseling Psychologist at ASH, who recommended no diagnostic changes, but also noted that "[b]ased on [Plaintiff's] past history and current reporting of symptoms[,] his depression [could] be managed without issue in corrections." *Id.*, & Ex. C at 30-31.

A week later, on December 17, 2012, Plaintiff was "transferred back" to RJD where he was "placed in administrative segregation ["ASU"] due to no available beds." *Id.* ¶ 19. After his release from segregation, Plaintiff alleges to have begun "researching *Vitek* procedures," to have "written letters to the Prison Law Office" complaining that his commitment lacked the "appropriate procedural protections," and to have filed a CDCR 602 administrative appeal, Log No. RJD HC 13047781, on February 6, 2013, challenging the decision to commit him. *Id.* at 8, ¶¶ 19-20 & Exs. D & E at 32-50. On November 5, 2013, Plaintiff alleges Log No. RJD HC 13047781 was "denied at the highest level and exhausted." *Id.* at 12 ¶ 27 & Ex. E at 44-62.

In his Supplemental Complaint, Plaintiff contends that on February 27, 2013, he informed Dr. Hansson that he was "filing a complaint against him and Defendant Phan," and that he "wanted another psychiatrist appointed to [treat] him." *See* ECF No. 7 at 2 ¶ 2. Plaintiff claims Hansson was "irate," left his cell, and returned 15-20 minutes later with a correctional officer and a "prepared CDC 7225 Form (a Refusal of Examination and/or Treatment)," which indicated Plaintiff was "refusing to take his medication." *Id.* ¶ 3; Pl.'s Dep. at 47-49. Plaintiff claims Hansson told Plaintiff to sign the CDC 7225, but Plaintiff "crossed X out Defendant Hansson's writing and began to write down his reason why he did not want to see Defendant Hansson." *Id.* Plaintiff then claims Hansson "ordered Correctional Officer S. Masterson to confiscate [the CDC 7225] and they both left." *Id.* at 3 ¶ 4; Pl.'s Dep. at 48-51. Plaintiff contends Hansson "ended up shredding" the CDC 7225, on which Plaintiff had written "Due to a conflict of interest, I don't want to see this doctor anymore." Pl.'s Dep. at 50. Plaintiff denies telling Hansson he "want[ed] out of mental health," and claims he "never told [Hansson] [he] didn't want to take medication." *Id.* at 49.

A week later, when Plaintiff "noticed his blue pill for his depression was not being administered," he was "informed by the nurse it was discontinued." ECF No. 7 at 3 ¶ 5. Plaintiff requested a review of his medical file and alleges to have discovered "falsified medical documentation" related to his February 27, 2013 interaction with Hansson. *Id.*

6

Specifically, Plaintiff alleges Hansson "destroy[ed] the original CDC 7225 Form" presented to him, and "falsified documentation" in his medical file indicating he had refused medication. *Id.* at 3-6, 11-12, ¶¶ 5-6, 11-12; Pl.'s Dep. at 48-51.

Plaintiff alleges to have filed a CDCR 602 administrative appeal, Log No. RJD HC 13048401, requesting a "criminal investigation" related to the incident. ECF No. 7 at 3-6 ¶¶ 5-6, 11-12 & *id.* at 46-50, Pl.'s "602 Exhibit B." On May 15, 2013, Plaintiff was interviewed regarding Log No. RJD HC 13048401, "appointed another psychiatrist and … placed back on his medication." *Id.* at 4 ¶ 6. Because prison officials "failed to investigate" his claims related to Hansson's alleged falsification of his medical records, however, Plaintiff alleges he "resubmitted this appeal requesting an investigation." *Id.*

Approximately two weeks later, on June 6, 2013, Plaintiff claims he was called into the Program Office and informed by Lt. Pendleton that he was suspected of writing "graffiti ... against a mental health clinician." *Id.* ¶ 7; Pl.'s Dep. at 46. Four hours after, Plaintiff was "placed into administrative segregation" based on his allegedly "inappropriate behavior." *Id.* at 4 ¶ 8; *id.* at 20 "CDC 114-D," dated June 6, 2013; Pl.'s Dep. at 46-47. Plaintiff was issued another CDC 114-D on August 1, 2013, informing him that he was "being retained" in segregation "pending ICC review for appropriate program and housing needs," and based in part on a confidential memorandum dated June 7, 2013, which implicated him. ECF No. 7 at 4-5 ¶¶ 8-10; *id.* at 22.

Plaintiff claims he remained in segregation for six months "without any evidence or disciplinary write up," and based "on a false premise of 'inappropriate behavior on a mental health clinician.'" *Id.*; Pl.'s Dep. at 54-55. Plaintiff further contends "these actions were deliberately planned" for "retaliatory purposes" due to his having filed CDCR appeal Log Nos. RJD HC 13047781 and RJD HC 13048401. *Id.* at 9-10, ¶¶ 20-21. Plaintiff claims he was eventually transferred from RJD's ASU to "another institution" on December 11, 2013. (ECF No. 7 at 8; ECF No. 55 at 45.)

///

///

3:13-cv-02971-BTM-RBB

**B.     Defendants' Claims**

Dr. Phan, a licensed psychologist, was Plaintiff's clinician, and a member of his Interdisciplinary Treatment Team ("IDTT") at RJD from September 6, 2012, through November 26, 2012, when he was transferred to ASH. *See* ECF No. 84-8 (hereafter "Phan Decl.") at 1 ¶¶ 1-2. In that capacity, Phan treated Plaintiff, who had been transferred from a "basic level" of mental health care (CCCMS) to the "EOP" or Enhanced Outpatient Program, which provided inmates with a "higher level" of mental health care, "approximately once a week, every week." *Id.* at 2 ¶¶ 2, 4. During that time, Plaintiff was diagnosed with a "major depressive disorder, recurrent, severe without psychotic features." *Id.* ¶ 3. Phan claims Plaintiff was "angry and continually depressed," that he "cr[ied] during the majority of their sessions together, had pent-up rage," "made statements of passive suicidal ideation," had a criminal "history of impulsive behaviors," and "was not improving despite long-term treatment." *Id.* ¶ 3. Phan claims that based on her training, "[t]he combination of [Plaintiff's] limited family support, continual worsening depression, anger, passive suicidal ideation, and history of impulsivity" increased the risk that he would harm himself or others. *Id.* ¶ 4. For "these reasons alone," Phan recommended Plaintiff "be referred for an involuntary transfer" to the Department of Mental Health ("DMH"). *Id.* at 2 ¶ 4.

Phan met with Plaintiff, together with the rest of his treatment team, on November 5, 2012, to discuss his mental health, their "recommendation for further treatment," and to request that he voluntarily agree to a transfer to ASH. *Id.* at 3 ¶ 5. Dr. Phan claims she "offered [Plaintiff] a CDCR Form 7480 'Inmate/Patient Response'" form which explained the IDTT's recommendation for further psychiatric treatment, and which also requested his consent to the transfer. Phan claims Plaintiff "understood what was said," but "continued to argue that he did not need to go to DMH, that the IDTT was making a mistake." *Id.* at 4 ¶ 8. Therefore, Plaintiff "disagreed with the recommendation," "refused to voluntarily go to ASH," and "would not sign the Form 7480." *Id.* at 4-5 ¶¶ 5, 8. Phan ///

1    claims that she, "along with Licensed Clinical Social Worker ("LCSW") H. House,[5]

2    signed the Form 7480 and noted Plaintiff's refusal to sign." *Id.*; *see also* Ex. A.

3         As Plaintiff's clinician, Dr. Phan further claims to have also filled out a "Form

4    128-B1 Notice of *Vitek* Hearing," on November 5, 2012, and to have given it to House,

5    who as the "coordinator for inmate transfers," was "responsible for ensuring that the

6    patient receive[d] a copy of the form through either personal delivery or delivery through

7    the institutional mail." *Id.* at 3-4 ¶ 7 & Ex. B; *see also* ECF No. 84-10 (hereafter "Stratton

8    Decl.") at 3 ¶ 6. Phan claims that while she was a member of Plaintiff's IDTT, the *Vitek*

9    committee "plans the hearing date," she "was not part of that committee, and [she] did

10   not participate in the *Vitek* committee's decision." Phan Decl. at 3 ¶ 7; Stratton Decl. at 3-

11   4 ¶ 8. However, as a member of Plaintiff's IDTT, Dr. Phan believed Plaintiff "fit the

12   criteria" required to justify an involuntary transfer. Phan Decl. at 4 ¶ 9; Stratton Decl. at 3

13   ¶ 7.

14        Because Plaintiff objected to his transfer to DMH, he "invoked his right to a due

15   process hearing," governed by *Vitek*, and as provided by the California Department of

16   Corrections and Rehabilitation's Operations Manuel ("DOM"), section 62030.4.2. *See*

17   ECF No. 84-10 (hereafter "Stratton Decl.") at 4 ¶ 9. Defendant Stratton, as RJD's Chief

18   Acting Deputy Warden presided over Plaintiff's *Vitek* hearing, which was held on

19   November 16, 2016. *See id.* at 2, 3 ¶¶ 2, 8. Dr. D. Dumas, PsyD, a RJD psychologist who

20   was not treating Plaintiff, also served on the Committee, as did Correctional Counselor II

21   J. Stovall, who served as the recorder.[6] *Id.* at 3-4 ¶ 8. Defendant Flynn, another

22   Correctional Counselor, was assigned as Plaintiff's staff assistant for the hearing. *Id.* at 4

23   ¶ 8; *see also* ECF No. 84-6 (hereafter "Flynn Decl.") at 1-2 ¶¶ 1-2. Defendant Stratton

24

25   _____

26   [5] LCSW H. House is not named as Defendant in this action.

27

28   [6] Neither Dumas nor Stovall are named as Defendants.

9

claims Plaintiff was given "more that 72 hours notice of this hearing prior to it occurring," and claims that this is "shown in the 128-B1 form dated November 5, 2012," which he further attests was signed by Phan, and delivered to LCSW House, for delivery to Plaintiff. *See* Stratton Decl. at 3, 4 ¶¶ 6, 9 & Exs. B & C.

Defendant Flynn claims it was not until "the morning of November 16, 2012," that he was "inform[ed] … [he] was being assigned as [Plaintiff's] staff assistant," and he admits "[t]his was the first time [he] was aware of a *Vitek* hearing." Flynn Decl. at 2 ¶ 2. Flynn claims that as staff assistant, "he had no input in the … committee's decision," "did not schedule the *Vitek* hearing," and was not asked to give Plaintiff "any notice of the hearing." *Id.* at 4 ¶ 8. Instead, Flynn understood his role was to assist Plaintiff in "collecting, presenting and confronting evidence at the hearing." *Id.* at 2, 4 ¶¶ 2, 7. Therefore, Flynn "had [Plaintiff] removed from his cell," "informed him that [he] would be his staff assistant," "met with him to prepare," and escorted him to the hearing. *Id.* at 2, 3 ¶¶ 3, 6. Defendant Flynn attests that Plaintiff "did not request any witnesses or documentary evidence," did not object on grounds "that he was not given notice of the hearing," and "did not say that he was otherwise unprepared to go forward with the *Vitek* hearing." *Id.* at 2-4 ¶¶ 3, 6-7; *see also* Stratton Decl.  4 ¶ 11. To the contrary, both Flynn and Stratton claim Plaintiff "specifically rejected … offer[s] to assist," and told Flynn he "did not want a staff assistant," because he "did not agree that he needed or would benefit from a transfer to DMH" and was "confident" he would *not* be transferred. *Id.* Flynn contends he "still attempted to perform [his] duties," but Plaintiff "continued to rebuff [his] efforts to help." *Id.* Flynn further claims that during the hearing, Stratton "explained" to Plaintiff why he was brought to the *Vitek* hearing, "what evidence … caused the hearing to be convened," what the committee's decision was, and why they reached their conclusion. Flynn Decl. at 3 ¶ 4. Flynn claims Stratton "would always stop after making a brief statement," and ask Plaintiff if he understood. Flynn claims Plaintiff "acknowledged that he did." *Id.*

///

Defendant Stratton claims Plaintiff's "psychiatric records were available" to the *Vitek* committee, and that he, Dumas, and Stovall "reviewed those records and [Plaintiff's] psychiatric status and treatment needs." Stratton Decl. at 4 ¶ 9. Stratton claims the *Vitek* committee reviewed Plaintiff's IDTT evaluations, his "need of in-patient psychiatric treatment," and the recommendation for transfer based on his "major depressive disorder," which was "recurrent, [and] sever[e] without psychotic features." *Id.* ¶ 10. The Committee noted Plaintiff's "anger," "continual[] depress[ion]," lack of improvement "despite long-term treatment within CDCR," and his "statements of passive suicidal ideation," which Stratton "understood to mean" that he felt "it would be better if he were no longer alive." Stratton Decl. at 4 ¶ 10.

During the *Vitek* hearing, Plaintiff continued to disagree with the transfer. *Id.* at 4-5 ¶ 11. Specifically, Plaintiff argued that while he was "a little depressed" due to his mother's death, he "just needed to talk to someone." *Id.*; *see also* Ex. C. Plaintiff further claimed that he would remain depressed no matter where he was, that hospitalization would be costly, and not "beneficial" to him; therefore, he preferred to stay at RJD where he "had not gotten any write-ups," and had "a good job [he] d[idn']t want to lose." *Id.* However, Defendant Stratton, together with Dr. Dumas, "agreed with the IDTT's recommendation and determined it was in [Plaintiff's] best interests to be transferred to the DMH for further mental health treatment." *Id.*

Stratton contends he directed Defendant Flynn to "meet with [Plaintiff] after the hearing to assist [him] with understanding the committee's decision," and "advise [Plaintiff] of his appeal rights." Stratton Decl. at 5 ¶ 12. Flynn claims Plaintiff refused to meet with him after the hearing. Flynn Decl. at 3 ¶ 6.  Stratton further claims the *Vitek* committee's written decision was "reflected in [a] 128-G form dated November 16, 2012," which is "not a confidential document," "was readily available," and "would have been provided to [Plaintiff]." Stratton Decl. at 5 ¶ 12 & Ex. C.

Pursuant to the *Vitek* committee's November 16, 2012 decision, Plaintiff was transferred to ASH "on or about November 27, 2012." *Id.* at 3 ¶ 8; Phan Decl. at 4 ¶ 10.

11

1  Defendant Phan claims that despite Plaintiff's objections, his medical records from ASH

2  show his mental health "actually improved during his stay there." Phan Decl. at 4 ¶ 10 &

3  Ex. C.

4  After his discharge from ASH on December 17, 2012, Plaintiff was transferred

5  back to RJD and placed in the ASU, pending clearance for a housing placement by the

6  Institutional Classification Committee ("ICC"). Stratton Decl. at 5 ¶ 13. Plaintiff was

7  eventually "given a housing assignment on Facility A," where Dr. Phan worked.  Phan

8  Decl. at 5 ¶ 12.

9  Upon his return, Dr. Phan claims Plaintiff "began exhibiting harassing and hostile

10  behavior" toward her. *Id.* Specifically, on December 20, 2012, Phan claims an ASU

11  clinician named Poage warned her Plaintiff "was harboring a great deal of anger towards

12  [her]," and that he was being transferred back to Facility A. Poage alerted "various staff

13  and her superiors about her concerns for [Phan's] safety," and recommended Plaintiff not

14  be assigned to Dr. Phan "because of his rage and hostility toward [her]." *Id.* On January

15  3, 2013, Phan claims Plaintiff "made verbal comments to [her] threatening [her] license,"

16  and was "hostile" and "aggressive to [her] face." *Id.* ¶ 17. Phan also claims that on

17  unspecified occasions, Plaintiff "would give [her] angry looks," and "leered at [her] when

18  she walked by," or when he "saw [her] in the [Mental Health Services] building while

19  [she] retrieved [her] inmate-patients from the waiting area." *Id.* On one occasion, Phan

20  claims Plaintiff entered a group-therapy session she was conducting with other patients,

21  and said, "Oh, wrong room." *Id.* ¶ 18. Phan believed the interruption "could not have

22  been an innocent mistake," was meant to "intimidate" her, and stemmed from Plaintiff's

23  anger related to his transfer to ASH. *Id.* ¶¶ 17-18.

24  Other clinicians also "noted [Plaintiff's] fixation toward [Phan]" upon his return to

25  Facility A. *Id.* ¶ 15. For example, D.L. Daub, a Senior Psychologist and Dr. Phan's

26  Supervisor, interviewed Plaintiff in March 2013, and reviewed his mental health records.

27  *See* ECF No. 84-4 (hereafter "Daub Decl.") ¶¶ 1-2. Daub claims Plaintiff's records

28  "contain multiple entries documenting [Plaintiff's] anger and vituperation toward Dr.

Phan," and include "notes taken during psychiatry sessions with [Defendant] Hansson on January 3 and January 30, 2013," during which Plaintiff "repeatedly referred to Dr. Phan as a 'fucking gook.'" *Id.* ¶ 4. Daub claims Plaintiff again referred to Dr. Phan as a "gook" both during a March 23, 2013 interview with Dr. Kaftarian, the Chief Psychiatrist, and again during an interview with him on March 29, 2013, related to Plaintiff's "inmate appeal." *Id.* ¶¶ 6-7. The doctors on both occasions told Plaintiff "such language was inappropriate," that it constituted "a racial slur," and cautioned him to "be respectful." *Id.*

M. Howard, another licensed clinical social worker who treated Plaintiff "at Donovan in 2013," claims Plaintiff "made an impression" during both individual and group therapy sessions by "tak[ing] up most of the time … talking about his anger toward … Dr. Phan … and Dr. Hansson," and "maintain[ing] [they] were responsible for his involuntary admission to ASH, which caused him to lose his job in the culinary department." *See* ECF No. 84-7 (hereafter "Howard Decl.") ¶ 2. Howard attests Plaintiff was "mostly angry during individual sessions," and often referred to Dr. Phan as "a gook" and Dr. Hansson as "that butcher." *Id.* ¶ 3. On May 8, 2013, during a "suicide risk evaluation," Plaintiff "stood up from his chair," "pounded his finger on [Howard's] desk," and "demanded" he not be marked as a "sex offender." *Id.* ¶ 4. During the same session, Plaintiff claimed he was "depressed" and "in reference to Dr. Phan," stated, "I'm going to tell you something: '[I]f I get that job back [in culinary] that woman can shove it up her fucking small gook's ass.'" *Id.*; *see also* Daub Decl. ¶ 4. Howard claims to have "made numerous attempts to engage [Plaintiff] in meaningful treatment," but claims efforts to "redirect him from making sexist and racist remarks about Dr. Phan were fruitless." Howard Decl. ¶ 5.[7]

On or about June 6, 2013, "handwriting was etched on the Mental Health Services Delivery System (MHSDS) building door," which read: "E. Phan Gook." Daub Decl. ¶ 3;

---

[7] Neither Daub nor Howard are named as Defendants.

*see also* Phan Decl. ¶ 13. "It was suspected that [Plaintiff] wrote that 'graffiti'" because it referred to Dr. Phan, who is of South East Asian ancestry, and who was Plaintiff's former psychologist. Daub Decl. ¶ 3. On the same day, Phan claims Plaintiff's clinician, Poage, told her Plaintiff "would talk about [Phan's] breasts," while she was treating him, and asked why Phan, who had just given birth, had gotten breast implants. Phan Decl. ¶ 14. Phan claims Plaintiff also told Poage Phan was "sexually inappropriate with him when [she] was his clinician prior to his transfer to ASH." *Id.* Phan avers she was "nothing but professional" every time she interacted with Plaintiff. *Id.*

"Out of concern for Dr. Phan," Dr. Daub reviewed Plaintiff's mental health records on June 6, 2013, *id.*, and "based on [Plaintiff's]] actions and comments," rendered a "professional opinion and judgment that [Plaintiff] was fixated on Dr. Phan in a dangerous and unhealthy manner." *Id.* ¶ 8. Daub "considered [Plaintiff's] behavior to be predatory," and "nothing short of harassment." *Id.* Because Daub was "concerned for Dr. Phan's physical safety, and for no other reason," Daub "recommended to custody supervisors that [Plaintiff] be placed in [ASU] and transferred" from RJD. *Id.* Daub attests these actions "were not taken out of spite or in retaliation," and that the "sole focus and motivation was to protect Dr. Phan and quell an apparently simmering situation from boiling over into violence." *Id.*

Phan also feared for her safety based on Plaintiff's "harassing and hostile behavior" which had "escalated" to the point Phan felt she "could not effectively do [her] job as a psychologist with [Plaintiff] in the prison." Phan Decl. ¶ 19. Phan claims she never made any "false report" and did not "retaliate" against Plaintiff "for any protected behavior he may have engaged in, or because he filed an inmate appeal against her." *Id.* ¶ 21. Phan did report Plaintiff's behavior and her fears to custody staff, however, and believed they justified a "write up for harassment" and a transfer from RJD based on the "numerous hostile, sexist, and racist comments he made to [her] and about [her]," and "because of [Plaintiff's] long documented criminal history of violence," "stalking," and obsession towards women. *Id.* ¶¶ 11, 21, 22. Phan claims she was aware Plaintiff was

14

"placed in ASU on June 6, 2013 … pending an investigation into his inappropriate behavior," and that he remained there until his transfer out of RJD was approved on November 19, 2013, but claims she had "no authority to place an inmate in ASU or retain an inmate therein." *Id.* ¶ 22.

Plaintiff was issued a CDC 114-D Administrative Placement Notice, commonly referred to as a "lock up" order, on June 6, 2013. Stratton Decl. ¶ 15 & Ex. D (ECF No. 84-10 at 24).[8] The CDC 114-D informed Plaintiff he was being placed in ASU "pending investigation into inappropriate behavior on [a] Mental Health Clinician." *Id.* Ex. D. As Captain for RJD's Facility A, S. Sanchez "conducted [a] 114-D Administrative Review" of Plaintiff's ASU placement on the following day, June 7, 2013. *See* ECF No. 84-9, Declaration of Captain S. Sanchez (hereafter "Sanchez Decl.") ¶¶ 2, 5; Stratton Decl. ¶ 15. Sanchez was also "familiar with" Plaintiff and was "involved in [the] investigation into [his] alleged inappropriate behavior toward Dr. E. Phan." Sanchez Decl. ¶ 2.[9]

The investigation into the allegedly "inappropriate behavior" supporting Plaintiff's ASU placement was documented in a confidential memorandum addressed to Captain Sanchez and dated June 7, 2013. Stratton Decl. ¶ 16; Sanchez Decl. ¶ 6. Sanchez reviewed the confidential memo and four attachments which "related to information

---

[8] According to Sanchez, Plaintiff's June 6, 2013 ASU placement was appropriate pursuant to CAL. CODE REGS., tit. 15 § 3335, which provides that "[w]hen an inmate's presence in an institution's General Population (GP) presents an immediate threat to the safety of the inmate or others, endangers institutional security or jeopardizes the integrity of an investigation of alleged serious misconduct, criminal activity, or the safety of any person, the inmate shall be immediately removed from the GP and placed in administrative segregation." Sanchez Decl. ¶ 4. Plaintiff's June 6, 2013 CDC-114 is signed by Lt. V. Sosa, who checked both the "immediate threat to safety" and "endangers institutional security" boxes justifying Plaintiff's ASU placement. The CDC-114 also indicated it was served upon Plaintiff, who refused to sign it. Neither Correctional Officer E. Reyes, nor V. Sosa are named as Defendants in this action. (ECF No. 84-9 at 14; ECF No. 84-10 at 24.)

[9] Captain S. Sanchez is not a party to this action.

provided by four different confidential sources." *Id.* None of these sources were inmates, and Plaintiff was provided a CDC 1030 "Confidential Information Disclosure Form" for each source of confidential information relied upon to support his June 6, 2013 CDC-114 "lock up" Order. Stratton Decl. ¶ 16 & Ex. F; Sanchez Decl ¶ 6 & Ex. B. According to both Stratton and Sanchez, the confidential sources "indicated that [Plaintiff] either wrote [the] offensive graffiti about Dr. Phan, or urged other inmates to [do so]." *Id.* "The conclusion of the confidential memorandum differed in opinion from the authors of the confidential attachments as whether [Plaintiff] presented a security risk to Dr. Phan." Sanchez Decl. ¶ 6; Stratton Decl. ¶ 16. Sanchez also "disagreed with the memo's conclusion." *Id.* Therefore, Plaintiff was retained in ASU and brought before an Institutional Classification Committee ("ICC") for an "initial ASU review" on June 13, 2013. Stratton Decl. ¶ 17; Sanchez Decl. ¶ 8.[10]

Plaintiff's June 13, 2013 ICC, of which no Defendant in this case was a member, reviewed the June 7, 2013 confidential memorandum, its four confidential attachments, and noted the difference of opinion between the memo's author and its sources as to whether Plaintiff "present[ed] as a security risk to a specific staff member." *See* Sanchez Decl. ¶¶ 8-9 & Ex. G (ECF No. 84-9) at 23; Stratton Decl. ¶¶ 17-18 & Ex. G (ECF No. 84-10) at 34. The members of Plaintiff's June 13, 2013 ICC also considered his case factors, and his statements—that he did not "have any problems with any staff members, and did not write or encourage others to write the offensive graffiti." Plaintiff also claimed he knew the identity of the confidential victim, and alleged she had a "history of fraud" and had "committed a felony" against him during a prior *Vitek* hearing. *Id.* The ICC then "deem[ed] that [Plaintiff] [wa]s an immediate safety risk to said staff member," "err[ed] on the side of caution," and referred him to a Classification Staff Representative ("CSR") for a "non-adverse" transfer endorsement to the California Medical Facility

---

[10] CAL. CODE REGS., tit. 15 § 3337(a), (b) (2016).

("CMF") EOP.[11] The ICC further noted no other "housing possibilities" were available due to Plaintiff's case factors and required level of care.[12] *Id.*

On July 15, 2013, CSR D. Hicinbothom rejected the ICC's June 13, 2013 decision to refer Plaintiff's for transfer to CMF-III, finding that its June 6, 2013 CDC-114 failed to provide Plaintiff with sufficient detail as to the justifications for his retention in ASU, and it failed to make clear its reasoning as to why ASU placement or transfer was necessary in light of the confidential memorandum's contrary conclusion. The CSR referred the case back to the ICC to address those issues. Stratton Decl. ¶ 20 & Ex. H (ECF No. 84-10 at 36); Sanchez Decl. ¶ 11 & Ex. D (ECF No. 84-9) at 25.

In response, a new CDC-114 D was issued on August 1, 2013 by Lt. Ortiz, and Captain Sanchez conducted another administrative review on August 2, 2013. Stratton Decl. ¶ 21 & Exs. I & J; Sanchez Decl. ¶ 12 & Ex. E. According to both Stratton and Sanchez, the new CDC-114 "contained more detailed information as to why [Plaintiff] was deemed a security risk to an employee," by identifying his "inappropriate behavior"

---

[11] Both Sanchez and Stratton cite CAL. CODE REGS., tit. 15 § 3335(e)(1)-(3) to require that the ICC's determination be reviewed by a CSR. *See* Stratton Decl. ¶ 19; Sanchez Decl. ¶ 10; *see also Miller v. McEwen*, 2013 WL 4545592 at *1 n.9 (S.D. Cal. April 19, 2013). Title 15's regulations governing segregated housing have since been revised and renumbered, however, and it is now CAL. CODE REGS., tit. 15 § 3337(c) (2016) which provides that "[a]ny inmate retained in administrative segregation at the initial ICC hearing shall be presented to a CSR within 30 days of the hearing for review and approval." A CSR is "a department employee designated to represent the Director in the classification process during the review, approval, or deferral of actions by [ICCs], including, but not limited to inmate transfers, inmate special housing program placements/retention, and custody designations." *Id.* § 3000. According to both Defendant Stratton and Captain Sanchez, "[t]he CSR's job is to independently review the ICC's decisions regarding an inmate's placement in ASU," and to act as a sort of "check and balance." The CSR is "not a rubber stamp for the ICC's actions," and has the "authority to overrule and reject the ICC's request and recommendation." Stratton Decl. ¶ 19; Sanchez Decl. ¶ 10.

[12] One "minority" ICC member also believed "a new 114 D should be issued." (ECF No. 89-9 at 23; ECF No. 84-10 at 34.)

as the "offensive graffiti about a mental health clinician." *Cf.* Stratton Decl. Exs. D & I.

On August 8, 2013, Plaintiff again appeared before an ICC, which included both Defendant Stratton and Captain Sanchez. *See* Stratton Decl. ¶ 22 & Ex. K (ECF No. 84-10 at 42); Sanchez Decl. ¶ 13 & Ex. F (ECF No. 84-9 at 30). The August 8, 2013 ICC reviewed Plaintiff's renewed CDC 114-D and determined it contained "more detailed information" as why he was deemed a "security risk to an employee" despite the fact that "the victim's name [was] not placed on the CDC 114-D due to the confidential nature of the investigation." Stratton Decl. ¶ 22 & Ex. K (ECF No. 84-10 at 42). The ICC further "re-examined the investigation into [Plaintiff's] alleged over-familiarity," as documented in the June 7, 2013 confidential memo, and considered all four of its confidential sources. "A majority of the quorum," including both Defendant Stratton and Captain Sanchez, determined, as did the June 13, 2013 ICC, that Plaintiff "continue[d] to pose as a security threat to the victim [Dr. Phan] who fear[ed] for his/her safety in [Plaintiff's] presence." *Id.* ¶¶ 22-25; *see also* Sanchez Decl. ¶¶ 13-16. The August 8, 2013 ICC "retained [Plaintiff] in ASU" and again referred him for a transfer to CMF–EOP, as it remained "the only prison that could house [him] at that time based on his combined case factors." Stratton Decl. ¶ 26; Sanchez Decl. ¶ 17.

On September 11, 2013, CSR W. Sanford reviewed the ICC's August 8, 2013 referral, but again refused to endorse Plaintiff's transfer to CMF because it was "not open at [that] time for inmates requiring lower bunk/lower tier housing." *See* Stratton Decl. ¶ 26 & Ex. L (ECF No. 84-10 at 44.). The CSR approved a 30 day extension of the ICC's action "to complete casework," including a re-evaluation of Plaintiff's noted "1845 disability verification" [CDC 128B dated 5/21/12], which indicated he required both lower bunk and lower tier housing. *Id.* The CSR noted that "otherwise[,] this case appears to need [a] difficult to place conference or return to ICC for other placement

///

///

///

18

considerations." *Id.* Ex. L.[13]

On September 26, 2013, Plaintiff appeared before another ICC for an annual and ASU retention review. Sanchez Decl. ¶ 18. Sanchez was again a member of this ICC, but Defendant Stratton was not. *Id.*; *see also* Stratton Decl. ¶ 27. The September 26, 2013 ICC noted both prior ICC decisions, and the CSR's suggestion that Plaintiff's "1845 be re-evaluated or that HC-POP get involved."[14] Sanchez Decl. (ECF No. 84-9) at 34. The ICC then noted a "128-B dated 5/12/13" in Plaintiff's file which "indicate[d] a Physical Therapist (PT) observed [him] walk[ing] around Facility-A yard several times without use of an assistive device." The PT noted "no evidence [Plaintiff] had an unsteady, unstable, or unsafe walk." *Id.* Therefore, the ICC's recorder "spoke with Dr. Chau … regarding a re-evaluation" of Plaintiff's 1845, but Chau indicated that "could take two to

---

[13] Both Defendant Stratton and Captain Sanchez refer to the CSR's decision to otherwise involve the "Health Care Placement Oversight Program." Stratton Decl. ¶ 26; Sanchez Decl. ¶ 17. "In October 2009, CDCR commenced a two-year pilot program, administered by its Health Care Placement Oversight Program (HCPOP), designed to increase placement of CDCR inmates in need of inpatient care in the DMH intermediate care programs," and in response to a still on-going class action lawsuit governing mental health treatment and care for California prisoners. *See Coleman v. Schwarzenegger*, No. CIV S–90–0520 LKK JFM (PC), 2010 WL 424442, at *2 (E.D. Cal. Jan. 27, 2010).

[14] A CDC 1845 is the form used to document a prisoner's disabilities and eligibility for the Disability Placement Program ("DPP"), adopted as part of a court-ordered remedial plan in *Armstrong*, a class action in the Northern District of California involving a certified class of all present and future California state prison inmates and parolees with disabilities. The Armstrong Remedial Plan enjoins practices that were found to discriminate against disabled inmates in California prisons. *See generally Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997); *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) (affirming order requiring submission of a remedial plan for compliance by the CDCR with the ADA and the Rehabilitation Act in California prisons); *Nort v. Brown*, No. 3:1-CV-1663-LAB KSC, 2015 WL 5155195, at *2 (S.D. Cal. Sept. 1, 2015); *see also Jones v. Scotland*, No. 2:12-CV-00633 TLN, 2015 WL 461633, at *5 (E.D. Cal. Feb. 3, 2015) (noting that the CDCR "use[s] an inmate disability verification form (i.e., a CDC–1845 form) to record an inmate's disabilities."), *report and recommendation adop*ted, No. 2:12-CV-0633 TLN DAD, 2015 WL 1347412 (E.D. Cal. Mar. 23, 2015).

three weeks." The ICC then asked the recorder to "speak with the victim's supervisor" about alternate housing possibilities at RJD, and elected to again retain Plaintiff in ASU, and request a 30-day extension from the CSR. *Id.* The ICC further ordered Plaintiff be "returned to ICC in one week for a status update." *Id.* ¶ 19 & Ex. H.

Plaintiff appeared again before the ICC on October 3, 2013. Stratton Decl. ¶ 29; Sanchez Decl. ¶ 20. Both Defendant Stratton and Captain Sanchez were members of the October 3, 2013 ICC. *Id.* A quorum of the October 3, 2013 ICC, including both Defendant Stratton and Captain Sanchez, again believed Plaintiff continued to pose a security risk if released from ASU based on a "notice received from the confidential victim [Dr. Phan] indicating that … she continue[d] to fear for … her safety." *Id.* & Exs. N & I. The October 3, 2013 ICC also noted that Dr. Chau was "currently re-evaluating" Plaintiff's CDC 1845 based on the PT's May 21, 2013 observations, but "in the meantime … assume[d] that [Plaintiff's] case factors [would] not change." Therefore, Plaintiff was retained in ASU and the ICC requested a "90-day extension pending HCPOP review" as a "difficult to place case." *Id.*

Two weeks later, on October 17, 2013, Plaintiff appeared again before the ICC. Defendant Stratton was not a member, but Captain Sanchez was. *See* Stratton Decl. ¶ 32; Sanchez Decl. ¶ 23. Again, the ICC noted Dr. Phan's October 1, 2013 statement indicating a continued fear for her safety, and the "majority of the ICC quorum agreed [Plaintiff] continued to pose as a security threat to [her]." Stratton Decl. ¶ 23 & Ex. J. The ICC further noted that Dr. Chau had re-evaluated Plaintiff's 1845 "not because of the CSR's suggestion, but rather due to information contained on [a] 128-B dated 5/21/13," wherein a PT had observed Plaintiff "walking without an assistive device." Sanchez Decl. Ex. J (ECF No. 84-9) at 38.

As a result, Plaintiff was issued a "new 1845 disability verification" as of October 1, 2013, indicating that while he "continue[d] to require lower bunk housing," he no longer required lower-*tier* housing. *Id.* (emphasis added). "This updated information … opened up" the possibility that Plaintiff could be transferred to CMC-E-III EOP *or* CMF-

20

1  III EOP, the ICC rescinded its prior referral to HCPOP, and retained Plaintiff in ASU

2  pending a transfer endorsement by the CSR to either of those institutions. *Id.*

3       On November 19, 2013, CSR W. Sanford approved Plaintiff's ASU retention

4  pending a now-endorsed transfer to CMC-E-III (EOP). *Id.* Ex. K.

5  **III.   Cross-Motions for Summary Judgment**

6        Plaintiff seeks summary judgment as to his due process claims against Defendants

7  Stratton, Hansson, Phan and Flynn arguing that the "overwhelming" evidence in the

8  record shows they did not "properly notify" him of his November 16, 2012 *Vitek* hearing,

9  did not provide him "qualified and independent assistance" during the *Vitek* hearing, and

10  never provided him a copy of the written decision justifying his transfer to ASH until

11  *after* he returned to RJD "and began writing to the Prison Law Offices." (ECF No. 55 at

12  4-10; 14-18, 24-27, 32-36, 40-42.).

13        Plaintiff further seeks summary judgment as to his retaliation claims, arguing that

14  his June 6, 2013 initial placement in ASU, and his 6-month retention in ASU, was

15  "retaliatory in nature," intended to "shock and punish" him for "seeking access to the

16  courts," "did not have a legitimate correctional goal," and was, instead, "due to his

17  decision to engage in [] protected conduct," specifically, the filing of two administrative

18  grievances:  Log No. RJD 13047781, filed on February 6, 2013 challenging his transfer

19  to ASH, and Log No. RJD 13048401, involving Defendant Hansson's alleged

20  falsification and or destruction of his medical records. (*Id.* at 2, 10-13, 18, 28, 39, 43-45.)

21        Defendants Stratton, Phan, and Flynn argue they are likewise entitled to judgment

22  as a matter of law because the evidence reveals no genuine dispute as to whether Plaintiff

23  was provided with "adequate due process for [his] *Vitek* hearing," (ECF No. 84-1 at 27-

24  29), or whether his placement in ASU, retention there, or ultimate transfer from RJD in

25  December 2013 was retaliatory. (*Id.* at 24-27.)[15]

26  _____

27  [15] Defendant Stratton also seeks summary judgment as to Plaintiff's claims that he violated

28  his "right to access the court" by "failing to respond to his administrative appeals /

### A.   Standard of Review

Any party may move for summary judgment, and the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). The Court "review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences." *Flores*, 824 F.3d at 897 (citing *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008) (citation omitted)).

///

---

complaints." (ECF No. 84-1 at 29-30.) Plaintiff only invokes his right to access to the Court once, however, and he does so in conjunction with his right to "petition the government for a redress of [his administrative] grievances," and in the context of his 6-month segregation in ASU placement, which he claims was retaliatory and based on the filing of his CDC 602 appeals involving his transfer to ASH. (ECF No. 7 at 9 ¶¶ 20-21.) Indeed, Plaintiff admitted that due process and retaliation formed the basis for his suit during his deposition, *see* Pl.'s Opp'n, Ex. C (ECF No. 90-1) at 53, and Defendants' previous Motion for Summary Judgment based on Plaintiff's alleged failure to exhaust his administrative remedies was denied on September 8, 2015 (ECF No. 34). Thus, because Plaintiff concedes his suit involves Defendants "throwing [him] in the hole, putting [him] in segregation, and sending [him] to a mental hospital without any due process," Pl.'s Dep., Ex. C (ECF No. 90-1) at 53, and he has never sought to assert any separate and free-standing access to court violation committed by any named Defendant, *id.*, summary judgment on those grounds is unnecessary. *See e.g., Eagle v. Bill Alexander Auto. Ctr., Inc*., No. CV11-1148-PHX-JAT, 2012 WL 12827629, at *1 (D. Ariz. June 5, 2012) (declining to decide whether Plaintiff exhausted a claim for harassment/hostile work environment under the ADEA on summary judgment where Plaintiff conceded he was not attempting to assert a state a separate, stand-alone ADEA claim for hostile work environment); *see also Graham v. Brazil*, No. C-97-0591 MHP, 1997 WL 601432, at *1 (N.D. Cal. Sept. 16, 1997) (finding district court had "no reason to decide" Defendant's motion for summary judgment as to a Jones Act claim where Plaintiff had not yet actually raised one).

Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. FED. R. CIV. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

Because Plaintiff bears the burden of proof at trial, to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun,* 509 F.3d at 984, and it must draw all inferences in the light most favorable to the nonmoving party. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

**B.    Due Process Claims – *Vitek* Hearing**

1.    Standard of Review

"'Among the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.'" *Kerry v. Din*, 135 S. Ct. 2128, 2137 (2015) (citing *Vitek*, 445 U.S. at 492).

In *Vitek,* the Supreme Court held that "transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." 445 U.S. at 494; *see also Manzanillo v. Moulton,* No. 13-CV-02174-JST (PR), 2014 WL 4793780, at *11 (N.D. Cal. Sept. 25, 2014) (noting that *Vitek* "held that the conjunction of stigmatization and mandatory behavior modification without procedural protections violated due process."). "The liberty interest at stake in *Vitek* mandated due process protections before both the classification of the inmate as 'mentally ill' and his resultant transfer to a mental hospital for involuntary psychiatric treatment." *Neal v. Shimoda*, 131 F.3d 818, 828 (9th Cir. 1997); *see also Wilkinson v. Austin*, 545 U.S. 209, 229 (2005); *Hendon v. Ramsey*, 528 F. Supp. 2d 1058, 1065 (S.D. Cal. 2007).

The procedural protections the Supreme Court found adequate to afford due process in *Vitek* are: (1) "written notice to the prisoner that a transfer to a mental hospital is being considered;" 445 U.S. at 494, (2) "[a] hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure … is made of the evidence being relied upon[,] … and at which opportunity to be heard in person and to present documentary evidence is given;" *id.*, (3) "[a]n opportunity at the hearing to present testimony of witnesses … and to confront and cross examine witnesses called by the state, except upon finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;" *id.* at 494-95, (4) "[a]n independent decisionmaker;" *id.* at 495, (5) "[a] written statement by the factfinder as to the evidence relied on and the reasons for [the] transfer[];" *id.*, (6) "qualified and independent assistance" to the inmate, provided by the State, *id.* at 499-500 (J. Powell, concurring),[16]

---

[16] While four Justices of the majority opinion in *Vitek* went further and would affirm the district court's requirement that an inmate be provided "legal counsel, furnished by the State, if the inmate is financially unable to furnish his own," *Vitek,* 445 U.S. at 495, Justice

24

and (7) "[e]ffective and timely notice of all the foregoing rights." *Id.* at 495; *see also Frederickson v. Wong*, No. 15-CV-02488-KAW, 2016 WL 3253831, at *2 (N.D. Cal. June 13, 2016). In this case, Defendants and Plaintiff point to Cal. Code Regs., tit. 15 § 3369.1 as the "codification" of *Vitek's* procedural requirements. (ECF No. 84-1 at 28-29; ECF No. 55 at 7-8.)

Cal. Code Regs., tit. 15 § 3369.1(a) provides that California inmates "considered for placement in a Department of Mental Health hospital pursuant to Penal Code section 2684 shall be informed of their rights to a hearing on the placement and to waive such a hearing." *Id.* § 3369.1(a). Except for those who "require emergency psychiatric hospitalization," which no party claims was Plaintiff's situation prior to his transfer to ASH, *id.* § 3369.1(b), inmates, like Plaintiff, who do not waive their right to the hearing "shall" be provided:

> (1) A written notice of the placement hearing at least 72 hours prior to the hearing.
>
> (2) An independent and qualified staff member to assist the inmate with their preparation for the hearing. Any costs or expenses incurred related to independent assistance obtained by the inmate on their own shall be the sole responsibility of the inmate.
>
> (3) An opportunity to present documentary evidence and the oral or written testimony of witnesses, and to refute evidence and cross-examine witnesses unless the hearing officer indicates a good cause for prohibiting such evidence or witnesses.
>
> (4) A hearing officer who shall be the institution head or a designee, which shall be a correctional administrator, physician, psychiatrist, or psychologist who is not involved with treating the inmate.
>
> (5) A copy of the written decision within 72 hours after the hearing, which shall include the reason for the decision and the evidence, relied

---

Powell's concurring opinion does "not require the State to furnish a licensed attorney to assist him." *Id.* at 497. Instead, "[d]ue process will be satisfied so long as the inmate facing involuntary transfer to a mental hospital is provided qualified and independent assistance," which may come from a layman adviser, so long as "he be free to act solely in the inmate's best interest." *Id.* at 499-500 (Powell, J., concurring).

upon in making the decision.

CAL. CODE REGS., tit. 15 § 3369.1(a)(1)-(5) (Jan. 1, 2016); *see also* Cal. Dept. of Corr. & Rehab. Op. Man. § 62030.4.2 (further providing that the staff assistant assigned is "usually the inmate's counselor," and that the copy of the decision "shall be given to the inmate within 72 hours after the hearing and … shall be placed in the inmate's C-file.").

### 2.   Discussion

Both Plaintiff and Defendants Phan, Flynn, and Stratton argue they are entitled to judgment as a matter of law as to whether Plaintiff was denied the due process protections required by *Vitek*. *See* ECF No. 55 at 4-10, ECF No. 84-1 at 27-29. But the record in this case clearly reveals genuine issues of material fact in dispute necessitating trial. *See* FED. R. CIV. P. 56(a).

Specifically, Plaintiff contends, under penalty of perjury, that while he was aware both Drs. Hansson and Phan wished him to "voluntarily" agree to a transfer to ASH as early as November 5, 2012, he was provided "<u>no</u> written notice" before the November 16, 2012 hearing, and was not provided a written statement of the evidence relied on or the reasons for the transfer until *after* he returned to RJD more than a month later. *See* ECF No. 1 at 6-7 ¶¶ 12, 14; Pl.'s Dep. at 56-57, 64-65; ECF No. 55 at 39-47. Plaintiff further swears he was not told Defendant Flynn would serve as his "staff assistant" until *during* the November 5, 2012 hearing, claims Flynn "did not act in his best interests" at the hearing, was simply "present," and was not qualified to assist him. (ECF No. 1 ¶ 13; Pl.'s Dep. at 65-66; ECF No. 55 at 7-8.).

For her part, Defendant Phan claims to have prepared a CDCR 7480 "Inmate/Patient Response Form" on November 5, 2012 notifying Plaintiff that his treatment team was referring him to DMH for psychiatric treatment and seeking his consent, but she claims Plaintiff "disagreed" and refused to initial the form. *See* Phan Decl. ¶¶ 5-6 & Ex. A (ECF No. 84-8) at 10. Both Dr. Phan and Defendant Stratton, who presided over Plaintiff's November 16, 2012 *Vitek* hearing, claim Phan also completed a CDC Form 128-B1 "Notice of *Vitek* Hearing" on November 5, 2012, and that she gave it

26

to LCSW House, who, as coordinator for inmate transfers, was responsible for its delivery, either in person, or through the institutional mail, on the same day. (Phan Decl. ¶ 7 & Ex. B, ECF No. 84-8 at 12; Stratton Decl. ¶¶ 5-9.) But the 128-B1 both Phan and Stratton attach as proof of the notice required by both *Vitek* and Cal. Code Regs., tit. 15 § 3369.1(a)(1), is signed only by Phan, does not include a date or time the *Vitek* hearing would take place, and it leaves blank the portion identifying anyone as Plaintiff's assigned staff assistant. (*Id.*). LCSW House has failed to file any affidavit as to the CDC Form 128-B1's *actual* delivery, however, and, as noted above, Plaintiff swears he never received it. (ECF No. 1 at 6 ¶ 12; Pl.'s Dep. at 56-57; ECF No. 55 at 46.)

Moreover, Defendant Flynn admits he, like Plaintiff, was not aware that Plaintiff's *Vitek* hearing would be held until the morning of November 16, 2012, when he was informed he had been assigned as Plaintiff's staff assistant. *See* Flynn Decl. (ECF No. 84-6) ¶ 2. Plaintiff swears Flynn "never interviewed or evaluated [him]" at any time prior to the hearing (ECF No. 1 at 6 ¶ 12; Pl.'s Dep. at 56-57), and was not qualified to assist him "competently" and "independently." (ECF No. 1 at 6, 10, 12; ECF No. 55 at 24-26.) Flynn claims he *did* "me[e]t with [Plaintiff] to prepare," was aware of his duty to help Plaintiff in "collecting, presenting, and confronting evidence at the hearing," and that he "made sure the procedures and issues discussed at the hearing were explained to [Plaintiff] in a manner that he would understand." (Flynn Decl. ¶¶ 2, 4.) Flynn contends Plaintiff "specifically rejected [his] offer to assist," told him "he did not want a staff assistant," and "rebuff[ed] [his] offers to help." (*Id.* ¶¶ 2-6.) Flynn also claims Plaintiff refused to meet with him *after* the hearing, and at no time objected, claimed to be unprepared, requested witnesses, or an opportunity to present documentary evidence. (*Id.* at ¶ 6.)

Finally, Plaintiff claims defendant Stratton, his *Vitek* hearing officer, never provided him with a copy of the CDC 128-G dated November 16, 2012, which documented the "evidence relied on" or the "reasons for []his transfer" to ASH, within the 72 hours required by Cal. Code Regs., tit. 15 § 3369.1(a)(5). (ECF No. 1 at 7.)

27

1  Plaintiff claims he only received a copy of this document, as well as the CDC Form 128-

2  B1 *Vite*k Notice signed and dated by Dr. Phan on November 5, 2012, *after* he returned to

3  RJD in December 2012, "began researching *Vitek* procedures," and in response to a letter

4  he wrote to the Prison Law Office. (*Id.* at 8-9 & Ex. D (ECF No. 1 at 32-42.) Defendant

5  Stratton claims, however, that the *Vitek* committee's "written decision [as] reflected in

6  the 128-G form dated November 16, 2012, … was readily available" to Plaintiff, is not a

7  "confidential document," and that he "would have been provided a copy" of it. *See*

8  Stratton Decl. ¶ 12 & Ex. C; *see also* CDCR Op. Man., § 62030.4.2 (providing that "[a]

9  copy of the [*Vitek* hearing] decision shall be given to the inmate within 72 hours after the

10  hearing and a copy shall be placed in the inmate's C-file.").

11      Given this record, the Court finds genuine disputes of material fact exist as to

12  whether Plaintiff was provided all the procedural protections required by *Vitek*. A

13  reasonable jury could believe that Plaintiff was deprived of adequate and timely notice

14  before he was involuntarily transferred to ASH, and therefore, was deprived of an

15  opportunity to meaningfully prepare or challenge the IDTT's determination that he

16  required in-patient psychiatric treatment in November 2012. An equally rational trier of

17  fact could determine that Defendants Phan, Flynn, and Stratton provided Plaintiff with

18  sufficiently adequate pre-deprivation notice, as well as an opportunity to be heard prior to

19  his transfer.[17] *See Zetwick v. Cty. of Yolo*, __ F.3d. __, 2017 WL 710476, at *3 (9th Cir.

20

21

22  [17]  Defendants claim summary judgment is also "warranted because Plaintiff was not
harmed from the transfer," and that his medical records show his "mental health greatly

23  improved from the treatment he received at [ASH]." (ECF No. 84-1 at 29, citing Phan Decl.

24  ¶ 10.) However, Plaintiff clearly *does* claim to have missed a visit from his brother, who
was "coming from another country," to have forfeited his prison job, and will have "this

25  commitment (to a mental hospital) … permanently … on [his] record." ECF No. 1 at 8, 13-
14 ¶¶ 17-18, 30-31; ECF No. 90-1 at 43.) *Vitek* itself is premised on the "stigma" and

26  "adverse social consequences" related to a mental health commitment and its potentially

27  "significant impact on the individual." 445 U.S. at 492 (citing *Addington v. Texas*, 441 U.S.
418, 425-26 (1979)). Moreover, "'the denial of procedural due process should [is]

28  actionable for nominal damages without proof of actual injury.'" *Weinberg v. Whatcom*

28

Feb. 23, 2017) (No. 14-17341) (noting that "[w]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'") (quoting *Direct Techs., LLC v. Elec. Arts, Inc*., 836 F.3d 1059, 1067 (9th Cir. 2016)).

For these reasons, both Plaintiff's and Defendants' Motions for Summary Judgment as to Plaintiff's due process claims must be DENIED.

### C.   Retaliation Claims

#### 1.   Standard of Review

"Prisoners have a First Amendment right to file grievances against prison officials," *Watison*, 668 F.3d at 1114, and "may not retaliate against a prisoner for exercising his First Amendment right to report staff misconduct." *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).

Because courts must also defer to the "reasonable decisions of prison officials," *id*. (citing *Turner v. Safley*, 482 U.S. 78, 84-85 (1987); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)), "[w]hen a prisoner claims retaliation, [courts] strike a balance by requiring him to show that (1) 'a state actor took some adverse action … (2) because of (3) [the] prisoner's protected conduct, … that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'" *Id*. (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted)); *accord Watison*, 668 F.3d at 1114-15; *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011); *Brodheim*, 584 F.3d at 1269.

#### 2.   Discussion

Both Plaintiff, as well as Defendants Phan, Stratton, and Flynn claim there is no genuine dispute as to Plaintiff's claims of retaliation, and that therefore, each is entitled to

_____

*Cty.*, 241 F.3d 746, 752 (9th Cir. 2001) (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)) (citations omitted).

judgment in his or her favor as a matter of law. (ECF No. 55 at 10-13, 42-47; ECF No. 84-1 at 24-27.) Except with respect to Defendant Flynn, the Court disagrees.

Specifically, Defendants claim Plaintiff was initially segregated upon his return to RJD in December 2012, because there were no available beds in the general population and he required clearance for housing by the ICC. (*See* ECF No. 84-1 at 24-25). Defendants Phan and Stratton further claim Plaintiff's subsequent segregation, spanning from June 6, 2013, up until he was ultimately transferred from RJD in December 2013, was "bas[ed] o[n] legitimate penological interests" was justified because "his presence posed a threat to the safety and security of the prison and [Dr.] Phan," and was "not retaliatory." (*Id.* at 25-27.) In support, Defendants Phan and Stratton rely primarily on Dr. Phan's Declaration (ECF No. 84-8), as well as the "multiple reports" she and Stratton received documenting Plaintiff's "deep-seated anger toward [Phan]," as well as Phan and Stratton's knowledge of Plaintiff's criminal history and "inclination for violence against women." (*Id.* at 25-26, citing Phan Decl. ¶¶ 12-20; Stratton Decl. ¶¶ 18, 24, 39-48; Daub Decl. ¶¶ 3-8; Howard Decl. ¶¶ 2-5; Sanchez Decl. ¶¶ 20, 23, 30-39.) Finally, Defendants seek summary judgment as to any retaliation claim against Defendant Flynn, since the record shows his only interaction with Plaintiff was during the November 16, 2012 *Vitek* hearing, and he was not involved in any decision related to Plaintiff's ASU placement beginning in June 2013 because he "was no longer employed at RJD at that time." (ECF No. 84-1 at 26; Flynn Decl. ¶ 9.)

For his part, Plaintiff concedes that after he returned from ASH on December 17, 2012, he was "placed into administrative segregation due to no available beds." (ECF No. 1 ¶ 19 at 8). However, he claims that *after* he began "researching *Vitek* procedures," he filed two CDCR 602 administrative appeals:  RJD Log No. HC 13047781, on February 6, 2013, challenging Defendant Phan, Hansson, Flynn, and Stratton's roles in transferring him to ASH, *see* ECF No. 1 at 8-12 ¶¶ 19-26 & Ex. E at 44-62; and another, on May 12, 2013, RJD Log. No. HC 13048401, after he discovered his medication had been discontinued, and "requesting a criminal investigation" based on Dr. Hansson's alleged

"falsification" of his medical documentation. *See* ECF No. 7 at 2-4 ¶¶ 1-9 & Ex. D-F at 23-62. On February 27, 2013, Plaintiff claims to have "informed the psychiatrist [Dr. Hansson] that he was filing a complaint against him and Defendant Emma Phan and that he wanted another psychiatrist appointed to him." (ECF No. 7 at 2 ¶ 2; Pl.'s Opp'n (ECF No. 90), Ex. C (ECF No. 90-1) at 47-52.) Plaintiff claims Hansson "became irate," was "demeaning," "unprofessional," and "told [him that [he] didn't know what [he] was doing when [he] filed the 602, [and] that [he was] opening up a can of worms." Pl.'s Dep. (ECF No. 90-1) at 49-51. Plaintiff further claims Flynn, Stratton, Hansson, and Phan "all worked the same yard," "talked to," and had "access to" each other because they worked in the mental health offices together, and that the evidence shows he was placed in ASU for "allegedly writing graffiti" based only on confidential documents, was never "given a write-up," and only "shortly after" he filed his administrative grievances against Phan, Hansson, Flynn and Stratton. (*Id*. at 45-51, 55, 62; *see also* Pl.'s Opp'n (ECF No. 90) at 14-18.) Plaintiff contends that "but for the filing" of his CDC 602s, "[he] wouldn't have gone to the hole." (Pl.'s Dep. (ECF No. 90-1) at 63; ECF No. 55 at 43-45.)

Based on this record, the Court finds no genuine material dispute exists as whether Plaintiff's *initial* placement in ASU upon his return to RJD from ASH in December 2012 was retaliatory. Defendant Stratton contends Plaintiff was not immediately assigned to a housing unit because the ICC needed to consider his case factors, whether he could be housed with other inmates, and whether there were "any enemies in [Plaintiff's] file that need[ed] to be avoided." (ECF No. 84-10 ¶ 13.) Plaintiff offers no evidence to contradict this; indeed, he concedes he was placed there "due to no available beds." (ECF No. 1 at 8 ¶ 19.)

No party further disputes that Plaintiff was placed in ASU on June 6, 2013, *after* he filed RJD Log No. HC 13047781, on February 6, 2013, and *after* he filed RJD Log. No. HC 13048401, on May 12, 2013–both of which alleged acts of wrongdoing on the part of Defendant Phan, Hansson, Flynn and Stratton. Nor is there any material dispute as to the following: (1) Plaintiff was placed in ASU on June 6, 2013, based on an ongoing

investigation into his allegedly "inappropriate behavior" involving a then-unidentified mental health clinician (Dr. Phan); (2) Plaintiff was retained in ASU based on claims that he posed, and continued to pose, a "threat to the safety and security of the institution," specifically Dr. Phan; (3) the investigation underlying Plaintiff's segregation was based on confidential information reported by five "non-inmate" sources identifying Plaintiff as the potential source of racist graffiti found etched on a door in the mental health building in Facility A where Plaintiff was housed and Dr. Phan worked; and (4) Plaintiff was retained in ASU for 6 months before he was ultimately approved for transfer to another facility.

First, the Court finds no genuine dispute exists to show that Defendant Flynn played any role whatsoever in Plaintiff's ASU placement beginning on June 6, 2013. Flynn attests that while he served as Plaintiff's staff assistant during the November 16, 2012 *Vitek* hearing, that "was the extent of [his] involvement." Flynn Decl. ¶ 9. Flynn further claims to have played no role in any decision to either place or retain Plaintiff in ASU as of June 6, 2013, and "was not employed at [RJD] at that time." *Id.* Plaintiff offers no argument to the contrary, he points to nothing to contradict Flynn's sworn testimony, and no evidence in the records demonstrates Flynn participated in any events post-dating Plaintiff's November 16, 2012 *Vitek* hearing. Therefore, the Court DENIES Plaintiff's Motion for Summary Judgment as to his First Amendment retaliation claims against Defendant Flynn, and GRANTS Defendants' Motion for Summary Judgment as to Defendant Flynn on the same grounds.

As for Plaintiff's retaliation claims against Defendants Phan and Stratton, however, the Court finds as a matter of law that Plaintiff's 6-month stay in ASU and his ultimate transfer from RJD in December 2013 amounts to "adverse action," *Shepard*, 840 F.3d at 688 (citing *Watison*, 668 F.3d at 1115; *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004)), and that his CDC 602 administrative grievances, filed in February 2012, and May 2012, constitute "protected conduct." *Id.* (citing *Austin*, 367 F.3d at 1170-71; *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997).

The Court further finds, based on the record before it, that genuine factual disputes exist as to the remaining three elements of Plaintiff's First Amendment retaliation claims against Defendants Phan and Stratton. *See Shepard*, 840 F.3d at 689.

Specifically, the Court finds a reasonable trier of fact could find *either* that Plaintiff's segregation for six-months and his ultimate transfer to a different prison "away from his family," (ECF No. 7 at 12), was sufficient to "chill or silence a person of ordinary firmness" from "complaining about officer misconduct," *id.* at 691; *Brodheim*, 584 F.3d at 1271 (citing *Mendocino Envtl. Ctr. v. Mendocino Cty*, 192 F.3d 1283, 1300 (9th Cir. 1999)), *or* that his ASU placement and transfer, officially classified and documented in his prison records as "non-adverse," did not amount to harm that was "more than minimal." *Shepard*, 840 F.3d at 691 (citing *Watison*, 668 F.3d at 1114.) An objective standard governs the chilling inquiry: Plaintiff does not have to show that "his speech was actually inhibited or suppressed," but rather need only prove that the adverse action at issue "would chill or silence a person of ordinary firmness from future First Amendment activities." *Rhodes*, 408 F.3d at 568-69; *Brodheim*, 584 F.3d at 1271.

The record demonstrates further factual disputes as to whether Plaintiff was placed into ASU on June 6, 2013, retained there for six months, and eventually transferred from RJD "because" he filed two CDC 602 inmate appeals, at least one of which, RJD Log No. HC 13047781, directly challenged both Defendant Phan and Stratton's participation in his involuntary commitment to ASH. *See* ECF No. 1, Ex. E at 43-62; *Rhodes*, 408 F.3d at 567-68; *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

"To prevail on a retaliation claim, a plaintiff must show that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). To show the presence of this element on a motion for summary judgment, Plaintiff must put "forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Defendants'] intent." *Brodheim*, 584 F.3d at 1271, *Bruce*, 351 F.3d at 1289. "[T]iming can properly be considered as circumstantial evidence of retaliatory

intent." *Bruce*, 351 F.3d at 1288 (quoting *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995)). Nonetheless, mere allegations of retaliatory motive are insufficient to defeat a motion for summary judgment. *See Morris v. Daly*, No. 2:12-CV-2845-JAM AC P, 2016 WL 796656, at *2 (E.D. Cal. Mar. 1, 2016).

Here, Plaintiff claims, in his sworn pleadings, his Motion for Summary Judgment, and when deposed, to have filed RJD HC Log No. 13047781 on February 6, 2013 (ECF No. 1, Ex. E at 44; ECF No. 7 at 2 ¶ 1),[18] and to have personally "informed the psychiatrist (Defendant Jan Hansson) that he was filing a complaint against him and Phan," on February 27, 2013. (ECF No. 7 at 2 ¶ 2.) Plaintiff claims Hansson was "irate," left his cell, and returned 15-20 minutes later with a correctional officer and a "prepared CDC 7225 Form (a Refusal of Examination and/or Treatment)," indicating (falsely) that Plaintiff had "refus[ed] to take his medication." *Id.* ¶ 3; Pl.'s Dep. at 47-49. Once Plaintiff realized his medication had been discontinued, he filed a second CDCR 602 administrative appeal, Log No. RJD HC 13048401, this time requesting a "criminal investigation" related to his February 27, 2013 interaction with Dr. Hansson. ECF No. 7 at 3-6 ¶¶ 5-6, 11-12 & Ex. B at 46-50. On May 15, 2013, Plaintiff was interviewed regarding Log No. RJD HC 13048401, "appointed another psychiatrist and … placed back on his medication." *Id.* at 4 ¶ 6. After prison officials allegedly "failed to investigate" his claims related to Hansson's falsification of Plaintiff's medical records, however, he "resubmitted this appeal requesting an investigation." *Id.*

Approximately two weeks later, on June 6, 2013, Plaintiff was issued his first CDC 114 "lock-up" order, and placed in ASU where he remained until December. *Id.* ¶ 7; Pl.'s Dep. at 46. Plaintiff swears "if [he] had not … filed these complaints … they wouldn't

---

[18] Plaintiff claims in his Supplemental Complaint to have filed this grievance on "February 14th, 2013," (ECF No. 7 at 2 ¶ 1), but the exhibit to which he refers shows he signed this CDC 602 on February 6, 2013. This appeal was marked "rejected" on February 14, 2013, but was ultimately "accepted" and "assigned" at the First Level of Review" on March 26, 2013. (ECF No. 1 Ex. E at 44).

have put [him] in the hole for writing graffiti, or allegedly writing graffiti." Pl.'s Dep. (ECF No. 90-1) at 63.

For their part, Defendants Phan and Stratton swear, and point to evidence in the record that they claim proves Plaintiff was placed in ASU on June 6, 2013 "solely on the basis of legitimate penological interests, and not in retaliation" for any grievance he filed. *See* ECF No. 84-1 at 26; Phan Decl. ¶ 21; Stratton Decl. ¶ 39. Both Defendants attest that Plaintiff's ASU placement, and his retention there, was justified based on confidential evidence, gathered during an internal investigation that suggested he either wrote offensive and racist graffiti directed toward Dr. Phan, or encouraged another inmate to do so, and that this, and other increasingly aggressive behaviors documented by her fellow mental health professionals, and directed toward Dr. Phan, had escalated to the point that both she, Stratton, and various other members of RJD mental health and correctional staff feared for Phan's safety, especially in light of Plaintiff's criminal history and "numerous arrests and convictions [involving] violence against women." *See* Phan Decl. ¶¶ 11-22; Stratton Decl. ¶¶ 16, 18, 24-25, 29, 39-48; Sanchez Decl. ¶¶ 2-7; 15-17, 20, 23, 30-39; Howard Decl. ¶¶ 2-5; Daub Decl. ¶¶ 2-8.

Defendants are surely correct to note that the preservation of internal order and discipline, as well as the maintenance of institutional security are "well-established" and "legitimate correctional goals." (ECF No. 84-1, citing *Procunier v. Martinez*, 416 U.S. 396, 412 (1972); *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989)). However, the question in this case is whether the record shows no genuine dispute as to whether Plaintiff's segregation and transfer "reasonably advanced such goals." *Shepard*, 840 F.3d at 692.

Plaintiff bears the ultimate burden to demonstrate that legitimate correctional purposes, such as preserving institutional order and discipline, did *not* motivate Defendants' actions, *Pratt*, 65 F.3d at 806-08, and that his ASU placement and transfer "did not reasonably advance a legitimate correctional goal.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568). However, "when there is a genuine issue of material

35

fact as to whether the action was taken in retaliation," "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process." *Bruce*, 351 F.3d at 1289.

The Ninth Circuit has recently noted in *Shepard* "[t]here's no doubt that corrections officers should strive for unharmed prisoners and untainted investigations." 840 F.3d at 691-92 (citation omitted). And it is beyond dispute prison officials are obligated to protect the safety of both inmates and staff alike. *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974); *Bruce v. Cate*, No. C-09-4649 JW (PR), 2012 WL 12887302, at *18 (N.D. Cal. Mar. 27, 2012), *aff'd*, 560 F. App'x 660 (9th Cir. 2014).

Here, however, as was the case in both *Bruce* and *Shepard*, a genuine dispute still exists as to whether Defendant Phan and Stratton's "stated penological goals were … legitimate," and not merely invoked as "as cover or a ruse to silence and punish" Plaintiff for having exercised his constitutional rights. *Bruce*, 351 F.3d at 1289; *Shepard*, 840 F.3d at 694. For example, Defendant Stratton attests that while he was a member of Plaintiff's August 8, 2013, and October 3, 2013 ICC's, and on both occasions, "participated fully" and agreed with the quorum that Plaintiff "continued to pose as a security threat to the staff-victim [Phan]," and Phan "continued to fear for her safety" in his presence, Stratton Decl. ¶¶ 22, 25, 29, it is the "CSR's job … to independently review the ICC's decisions regarding an inmate's placement in ASU." *Id.* ¶ 19. To the extent Stratton suggests the CSR's ability to "later review" Plaintiff's segregation and the ICC's recommendations to retain him there until transfer necessarily defeats Plaintiff's countervailing claims that Phan and Stratton's actions were retaliatory, Ninth Circuit precedents makes clear it does not. *See Shepard,* 840 F.3d at 692.

This is because summary judgment is improper if evidence suggests prison officials "used a valid procedure as subterfuge to obscure retaliation," *id.*, and to avoid trial, Defendants charged with retaliation cannot merely "assert that [their actions] served a valid penological purpose, even though [the prisoner] he may have *arguably* ended up where he belonged." *Bruce*, 351 F.3d at 1289 (citation omitted); *Shepard*, 840 F.3d at

3:13-cv-02971-BTM-RBB

692; *see also Rios v. Tilton*, No. 2:07-CV-0790 WBS KJN, 2013 WL 4541825, at *20-21 (E.D. Cal. Aug. 27, 2013) (finding pursuant to *Bruce*, that while summary judgment was proper as to the validity of plaintiff's gang validation on due process grounds, material factual disputes concerning its timing in relation to plaintiff's administrative grievance and defendants' allegedly retaliatory motivation required "resolution by trial."); *see also West v. Dizon*, No. 2:12-CV-1293 MCE DAD, 2014 WL 794335 at *7,*9 (E.D. Cal. Feb. 27, 2014) (finding "[t]he material allegations of plaintiff's verified complaint versus defendant['s] bald denial that he had any retaliatory motive," presented a "classic credibility contest that a motion for summary judgment cannot resolve.") (citing *Ford v. City of Yakima*, 706 F.3d 1188, 1194-95 (9th Cir. 2013) (reversing grant of summary judgment in favor of defendants with respect to First Amendment retaliation claim in part because plaintiff came forward with sufficient evidence from which a jury could find the defendant acted with a retaliatory motive); *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1112 (9th Cir. 2011) ("Summary judgment should be used prudently in ... cases involving motivation and intent.")).

Given these precedents and in light of this record, the Court finds genuine issues of material fact exist as to whether Defendants Phan and Stratton retaliated against Plaintiff by causing him to be placed in ASU beginning June 6, 2013, and by acting to ensure his retention there until he was approved for transfer to another facility nearly six months later, *because* he filed administrative grievances challenging their November 2012 involvement in his involuntarily commitment to ASH. Resolution of these issues is solely within the province of a jury—for courts ruling on motions for summary judgment may not engage in "[c]redibility determinations" or "weigh[] [the] evidence." *Anderson*, 477 U.S. at 255; *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

///
///
///
///

**IV.    Conclusion and Order**

For all the reasons explained, the Court:

1)    **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 55);

2)    **DENIES** Defendants' Motion for Summary Judgment (ECF No. 84) as to Plaintiff's *Vitek* due process claims against Defendants Phan, Flynn, and Stratton;

3)    **DENIES** Defendants' Motion for Summary Judgment (ECF No. 84) as to Plaintiff's retaliation claims against Defendants Phan and Stratton; and

4)    **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 84) as to Plaintiff's retaliation claims against Defendant Flynn only.[19]

**IT IS SO ORDERED**.

Dated:  3/29/2017

Hon. Barry Ted Moskowitz, Chief Judge
United States District Court

---

[19] As noted above, Dr. Laura Leard, the personal representative of Dr. Hansson's estate, has not moved for summary judgment, nor has she sought leave to join Defendant Phan, Flynn, and Stratton's Motion. Therefore, both Plaintiff's *Vitek* due process and First Amendment retaliatory segregation claims involving Dr. Hansson also remain to be tried.

38